**FILED**

JUL 2 9 2016

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CYNTHIA J. LARMON, | CIV. 14-5044-JLV |
| Plaintiff, | |
| vs. | ORDER |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Cynthia Larmon brought suit against the government

pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, to recover

damages arising from a slip and fall incident that occurred on the sidewalks

outside of the Rushmore building on Ellsworth Air Force Base ("Base").

(Docket 1).  The government asserts Ms. Larmon is barred from recovery

because it did not have notice the sidewalk was icy on the day Ms. Larmon

fell.  (Docket 20 at pp. 6-8).  The government also asserts Ms. Larmon's own

negligence in failing to watch where she was walking bars her from recovery

under South Dakota's comparative negligence statute.  Id. at 2-6.  On

January 12, 2016, the court held a two-day court trial.  The court ordered

post-trial briefing on the application of South Dakota's collateral source rule

in the event the court found the government liable for Ms. Larmon's injuries.

Federal Rule of Civ. P. 52 provides:

In an action tried on the facts without a jury or with an advisory
jury, the court must find the facts specially and state its conclusions
of law separately.  The findings and conclusions may be stated on

the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. . . ."

Fed. R. Civ. P. 52(a)(1).

The court observed the demeanor and judged the weight and credibility of all witnesses and evidence at the trial.   In making credibility determinations, the court considered the relationship of the witnesses' interests to the outcome of the case, the witnesses' demeanor while testifying, the witnesses' opportunity to observe and acquire knowledge of what they were testifying about, the extent to which the testimony was logical and internally consistent, and the extent to which the testimony was supported or contradicted by other credible evidence. See Leiber v. United States, No. 11-00699-CV-W-FJG, 2013 WL 5964427, at *1-2 (W.D. Mo. Nov. 8, 2013) (citing Perkins v. General Motors Corp., 709 F. Supp. 1487, 1499 (W.D. Mo.1989).   The court fully considered all of the testimony, evidence and arguments of the parties, whether or not explicitly discussed in this order.   Id.

"In the context of a trial without a jury, courts have consistently noted that Fed. R. Civ. P. 52(a) does not require either punctilious detail or slavish tracing of the claims issue by issue and witness by witness."   Id. (internal quotation marks and citations omitted) (quoting Fair Housing in Huntington Committee, Inc. v. Town of Huntington, New York, 316 F.3d 357, 364 (2d Cir. 2003)).

> A trial court's findings satisfy Rule 52(a) if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision. . . . If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court

2

> impliedly made a finding consistent with his general holding so long
> as the implied finding is supported by the evidence. . . . Where the
> trial court makes no direct reference to a claim but must necessarily
> have found a certain fact, the appellate court will imply such a
> finding.

Id. at 1 (quoting Reich v. Lancaster, 55 F.3d 1034, 1057 (5th Cir. 1995)).

## FINDINGS OF FACT

On the morning of January 12, 2012, Ms. Larmon reported for work at the

Rushmore building on the Base.   The temperature at the Base on January 12,

2012, never reached above 32 degrees Fahrenheit.   (TE 53 at pp. 10-11).[1]   Ms.

Larmon did not notice any condition on the sidewalks which would have alerted

her to danger.   Ms. Larmon had no windows in her office and does not

remember if she looked outside that day.   At approximately 4 p.m. when she

was leaving work, Ms. Larmon exited from an employee entrance of the

Rushmore building, walked approximately three steps and slipped and fell on the

sidewalk.   Ms. Larmon was wearing flat-heeled shoes at the time of the fall.   As

a result of the fall, Ms. Larmon sustained a trimalleolar ankle fracture and a

tibiotalar dislocation.   (TE 21 at p. 1).   Ms. Larmon's injuries were significant.

See, e.g., TE 27 & 28.   Ms. Larmon's injuries are discussed more fully in the

damages portion of the order.

---

[1]The court references the exhibits admitted at the court trial as "(TE __),"
specific page pincites are included where necessary.

The government admits Ms. Larmon slipped on a band of ice that formed on the sidewalk outside of an employee entrance of the Rushmore building after moisture dripped from the roofline onto the sidewalk below and froze. See Docket 7 at ¶ 17 (admitting that "the ice upon which plaintiff slipped appears to have formed upon the sidewalk from the precipitation melting on the roof of the Rushmore Center and falling from the roofline upon the sidewalk."); TE 54 at p. 1 (Ground Mishap Report) (noting that the gutter above the exit door "leaks causing a slick area to form when the weather is cold.").[2]   James Kjellerson, Ms. Larmon's supervisor who was present at the time of her fall, testified there was a thin band of ice from the roof, which was about a foot wide and covered the length of the sidewalk.[3]

To the people working at the Rushmore building, the formation of ice on the sidewalk where Ms. Larmon fell was a known, recurring condition. Nathaniel Patten, the Rushmore building custodian, testified:

> There [were] a lot of places around the building that would get like that. It's common knowledge. Most people knew about it, if not everybody knew. If it snowed within the last couple of weeks and it just hadn't completely melted off the roof, it's going to drip and it's

---

[2]Government counsel did not dispute the existence of the band of ice on the sidewalk at trial.

[3]Plaintiff's cross-examination of Mr. Kjellerson caused the court to question whether anyone actually put salt on the patch of ice where Ms. Larmon fell on January 12 as indicated in the Ground Mishap Report. See TE 54. This in turn corroborated the testimony of Ms. Larmon and Ms. Clermont that no salt was present at this entrance on January 12. See infra.

going to get on the sidewalks and there is going to be ice.  And so
every once in a while you'd throw some salt on it if you had to.  Most
of the time the sun would evaporate it, but there would still be ice
and you had to just kind of be careful.

(Docket 16-2 at p. 19:9-19).[4]

Mr. Patten testified the sidewalk got "really bad" where Ms. Larmon fell.
See id. at 22:12-24.[5]  Brittany Oswald, a member of the Military Flight
Personnel, who among others was responsible for the snow removal around
portions of the Rushmore building, testified via deposition that she observed
icicles melting at the location where Ms. Larmon fell "all the time," (Docket 16-1
at p. 33:8-14), and at that particular door the icicles would melt and "create ice
on the concrete because the wind would blow it frozen" creating ice.  Id. at
34:15-21.  Ms. Oswald described the location as particularly icy during the
winter months.  Id. at 8:8-10.

Precious Clermont, a former employee at the Base who worked at the
Rushmore building, testified via deposition that the portion of the sidewalk
where Ms. Larmon fell was particularly icy, even for the state of South Dakota.
See Docket 16-3 at p. 13:1-21).  Ms. Clermont testified:

---

[4]The court references deposition testimony according to the page and line
designation in the deposition transcript.

[5]The court overrules the government's objection to this portion of Mr.
Patten's deposition.  (Docket 34 at p. 1).  Mr. Patten as the Rushmore building
custodian is well-suited to describe the general condition of the sidewalk based
on his knowledge and observations gained while working there.

5

[W]hen you shovel right there, the snow from the roof would melt and form icicles, and then if it got any hotter, those icicles would melt along with the snow on the roof, and it would fall onto the ground. And, right there[,] there was no sun. It was a shaded area. And so that spot in particular was not exactly the safest spot. It was icy more often than not.

Id. at p. 13:14-21.

The court received differing explanations for the cause of the ice on the sidewalk where Ms. Larmon fell. Multiple witnesses testified the ice was caused by snow melting on the roof of the Rushmore building and dripping onto the sidewalk below. Robin Hill, the government's Fed. R. Civ. P. 30(b)(6) witness, testified via deposition that the Rushmore building had a drip edge that was not properly designed and caused water from the roof to run back into the roof's soffit, which was underneath the building's eaves. See Docket 16-4 at p. 11:7-20; see also TE 32 (Ms. Clermont provided the same explanation in her statement.)[6]; Docket 16-2 at p. 33:16-23 (Mr. Patten opined that icicles accumulated everywhere around the Rushmore building because there were no gutters and most probably dripped on the sidewalk.). Regardless of the cause of the ice, the crux of Ms. Larmon's complaint is not what caused the ice to form on the sidewalk but whether the government's response, or lack thereof, to the sidewalk's known, recurring icy condition was negligent.

---

[6]Consistent with the court's oral ruling at trial, the government's objection to the admission of Ms. Clermont's statement is overruled. See Docket 34 at p. 2.

6

The Base contracts with civilians to perform the majority of the snow removal at the Rushmore building.   (Docket 16-2 at p. 11:15-18) (Mr. Patten's deposition).   These contracts did not cover all of the sidewalks surrounding the Rushmore building.   Id. at p. 11:22-24.   The sidewalk where Ms. Larmon fell was among those sidewalks that were not maintained under a civilian contract.   Id. at 15:20-16:7.   The sidewalk was maintained by military personnel who officed in the Rushmore building.   Id.   Military personnel would remove snow from sidewalks which were nearby to the "wing" or "quad" office in which they worked.   Id. Military personnel were responsible for shoveling those sidewalks, including the sidewalk where Ms. Larmon fell, within one hour of snowfall. See Docket 16-1 at p. 5:14-6:7 (Ms. Oswald's deposition).   Military personnel were responsible for salting or sanding the sidewalks after they were shoveled and for maintaining sand and salt supplies.   Id.

The sidewalk where Ms. Larmon fell was maintained in an informal manner.   Lower ranking military personnel performed the shoveling and salting duties.   Ms. Oswald testified military personnel typically satisfied the one-hour shoveling requirement by shoveling the sidewalk when they arrived in the morning "and that's it."   Id. at p. 6:1-3.   Although Ms. Oswald testified "one, two, or three, maybe, people" would salt the sidewalk, see id. at p. 9:12-15, she never salted the sidewalk herself despite it containing a known icy spot, she could not identify with certainty any persons who might

have salted the sidewalk, and did not provide any indication as to how often the sidewalk was salted.   Ms. Oswald testified to the existence of snow removal schedules and military personnel shoveling and salting the sidewalk as needed.   The court, however, received no time sheets or snow removal schedule demonstrating the regular removal of snow and ice or any documentation establishing that the sidewalk was examined throughout the day.

Ms. Clermont testified that salt or sand used to regularly be present at the exit Ms. Larmon used but the supply had run out for a period of time prior to Ms. Larmon's fall on January 12, 2012.   (Docket 16-3 at p. 9:8-12).   Ms. Larmon does not remember seeing any salt available for use by the door where she fell, and she did not have any salt or sand on the clothes she wore on the day of the incident.   Ms. Larmon and Ms. Clermont testified there was a sign on that employee door instructing pedestrians to watch out for falling icicles.   See Docket 16-3 at p. 15:21-24.   The court finds Ms. Larmon's and Ms. Clermont's testimony credible in both regards and finds that no salt or sand was present for Ms. Larmon to use on January 12, 2012.   No one reported the formation of ice on the sidewalk to military personnel on January 12, 2012.

## CONCLUSIONS OF LAW

Ms. Larmon brings this case under the Federal Tort Claims Act

("FTCA"). The FTCA waives the government's sovereign immunity protection

for:

> [M]oney damages . . . for injury or loss of property, or personal injury
> or death caused by the negligent or wrongful act or omission of any
> employee of the Government while acting within the scope of his
> office or employment, under circumstances where the United States,
> if a private person, would be liable to the claimant in accordance
> with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

When resolving claims under the FTCA, federal courts look to the law of

the state where the tort occurred, here, South Dakota. See Washington v. Drug

Enforcement Admin., 183 F.3d 868, 873 (8th Cir. 1999).

### I.    Negligence Liability

"Negligence is the breach of a duty owed to another, the proximate cause of

which results in an injury." Janis v. Nash Finch Co., 780 N.W.2d 497, 500 (S.D.

2010) (internal quotation marks omitted) (quoting Stone v. Von Eye Farms, 741

N.W.2d 767, 770 (S.D. 2007)). "The existence of a duty owed by the defendant

to the plaintiff, which requires the defendant to conform to a certain standard of

conduct in order to protect the plaintiff against unreasonable risks, is elemental

to a negligence action." Id. (internal quotation marks omitted) (quoting Poelstra

v. Basin Elec. Power Coop., 545 N.W.2d 823, 825 (S.D. 1996)).

9

"As a general rule, the possessor of land owes an invitee or business visitor the duty of exercising reasonable or ordinary care for the benefit of the invitee's safety, and the possessor is liable for the breach of such duty."  Id. at 501 (internal quotation marks omitted) (quoting Mitchell v. Ankney, 396 N.W.2d 312, 313 (S.D. 1986).  "A business invitee is a business visitor who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land."  Id. (internal quotation marks and citations omitted).  Ms. Larmon qualifies as a business invitee in this case.  See Small v. McKennan Hosp., 437 N.W.2d 194, 199 (S.D. 1989) (holding that an employee qualified as a business visitor, which the Janis court subsequently defined as a business invitee).

A possessor of land in South Dakota "owes a business visitor or invitee the duty of using ordinary or reasonable care for the benefit of the invitee's safety." Luke v. Deal, 692 N.W.2d 165, 169 (S.D. 2005) (citing Luther v. City of Winner, 674 N.W.2d 339, 347 (S.D. 2004)).  "This general duty includes a duty to keep the property reasonably safe and a duty to warn invitees of concealed, dangerous conditions known to the possessor of land."  Gunville v. United States, 985 F. Supp. 2d 1101, 1104 (D.S.D. 2013) (citing Janis, 780 N.W.2d at 501).  "A possessor of land ordinarily is not liable to an invitee for harm caused by a dangerous condition on the land that is known or obvious to the invitee."  Id. (citing Luther, 674 N.W.2d at 347).

10

The South Dakota Supreme Court articulated the duty that a possessor of land owes an invitee as follows:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Janis, 780 N.W.2d at 502 (quoting Restatement (Second) of Torts, § 343).[7]

"Foreseeability, rather than knowledge, however, is the touchstone of the existence of the duty of reasonable or ordinary care." Id. (citations omitted). "A foreseeable risk of harm is one that would be anticipated by a reasonable person. . . . a landowner [however] is not required to take measures against a risk that would not be anticipated by a reasonable person." Id. at 502-03 (internal quotation marks, brackets and citations omitted).

In Ms. Larmon's case, it was foreseeable that an employee would slip and fall on the recurring patch of ice near this employee entrance which was used by approximately thirty people on a daily basis. See Docket 16-3 at pp. 15:25-16:9 (Ms. Clermont testified approximately thirty people regularly used that location

---

[7]The Janis Court clarified that " '[t]he duty to keep the property reasonably safe is, in turn, a subpart of the general duty to exercise reasonable care' for the benefit of others." Id. at 501 (quoting Mitchell, 396 N.W.2d at 314).

as their entrance and exit from the Rushmore building.).   Government personnel had knowledge that moisture would drip from the roof of the Rushmore building, whether due to a defective drip edge or the lack of a device to divert melting snow, onto the sidewalk below, freeze and form ice on the sidewalk outside of this employee entrance.[8]   The government had a duty to exercise ordinary and reasonable care in the maintenance of its sidewalks for the benefit of its business invitees, including Ms. Larmon.

The government breached this duty.   Government personnel were well acquainted with the recurring formation of ice at this location and did little, if anything, to prevent or mitigate its formation after shoveling the sidewalk early in the morning.   Although Ms. Oswald testified government personnel would continue to remove snow and ice from the sidewalk after the morning shoveling, her testimony was limited to general assertions that unspecified persons would monitor the condition of the sidewalk and take appropriate action.   Conversely, the Rushmore building custodian, Mr. Patten testified the sidewalk got really bad where Ms. Larmon fell.   Ms. Oswald testified the sidewalk where Ms. Larmon fell

---

[8]The accumulation of ice on the sidewalk where Ms. Larmon fell was not a natural accumulation of ice.   See Budahl v. Gordon & David Associates, 323 N.W.2d 853, 855 (S.D. 1982) (holding that "an owner or occupant of property is not liable to pedestrians for injuries resulting from a fall caused by the natural accumulation of snow and ice on a sidewalk in front of the property . . . .").   The South Dakota Supreme Court's decision in Budahl "can be read in no other way than to adopt the natural accumulation rule, but to not apply it when there is 'any credible evidence showing an unnatural or artificial accumulation of ice and snow. . . .'" Gunville, 985 F. Supp. 2d at 1107 (quoting Budahl, 323 N.W.2d at 855).

was particularly icy during the winter months.   Ms. Clermont also described the sidewalk outside of that employee entrance as particularly icy more often than not.   Ms. Larmon testified similarly.

The formation of ice on January 12, 2012, cannot be viewed in isolation. The patch of ice formed after moisture from the roof dripped onto the sidewalk below and froze.   Government personnel were aware of this recurring, unnatural formation of ice and did not attempt to fix problem until after Ms. Larmon fell (Docket 16-2 at p. 10-24) (Mr. Patten's deposition), nor did they place any ice melt material at the employee entrance for people to use at the time of Ms. Larmon's fall.   See supra.   Government personnel had an "ample amount of time and notice to correct the condition" causing the recurring formation of ice at this location and failed to do so.   Cf. Bland v. Davison Cty., 507 N.W.2d 80, 82 (S.D. 1993).

The government's claim it did not breach its duty to exercise reasonable or ordinary care because it did not have notice of the formation of ice on January 12, 2012, misses the mark.   The government had long known that ice routinely formed at this location and failed to remedy or ameliorate the situation.   The situation grew worse as the winter of 2012 continued.   See Docket 16-3 at p. 9:8-12 (Ms. Clermont testified that no salt was available for use at this location for a period of time leading up to January 12, 2012).   Under the facts and circumstances of this case, the court finds government personnel had a reasonable length of time to remedy this unsafe condition and failed to do so.

13

The court finds the government breached its duty to exercise ordinary and reasonable care in the maintenance of this portion of the sidewalk.

With regard to the elements of proximate causation and injury, the court, after considering the entirety of the evidence and weighing witness' credibility, concludes, and the government does not dispute, that the ice on the sidewalk outside of this employee entrance of the Rushmore building was the proximate cause of Ms. Larmon's fall which resulted in her injury. Ms. Larmon proved by a preponderance of the evidence all four elements of her negligence claim against the government. The court finds the government negligent.

### II. Comparative Negligence

Defense counsel asserts Ms. Larmon cannot recover any damages because her own negligence outweighs that of the government. South Dakota's "comparative negligence statute, SDCL 20-9-2, applies whenever both parties to a lawsuit could, under the evidence, be held negligent in causing the injuries." Urban v. Wait's Supermarket, Inc., 294 N.W.2d 793, 796 (S.D. 1980). South Dakota's comparative negligence statute only allows a plaintiff to recover "if his negligence was slight in comparison with the negligence of the defendant." Lovell v. Oahe Elec. Co-op., 382 N.W.2d 396, 399 (S.D. 1986) (citing SDCL § 20-9-2). "When facts show that the plaintiff, beyond reasonable dispute, was guilty of negligence more than slight, it is the function of the trial court to hold, as a matter of law, for the defendant." Id. citing (Starnes v. Stofferahn, 160 N.W.2d 421, 426 (S.D. 1968)). "The comparison is made with the negligence of

14

the defendant, rather than with the ordinarily prudent person.   Id. (citing Crabb
v. Wade, 167 N.W.2d 546, 549 (S.D. 1969)).   In assessing the quality of a
plaintiff's negligence, the South Dakota Supreme Court instructs:

> [T]hree factors may properly be considered in appraising the quality
> of a plaintiff's negligence: [1] the precautions [plaintiff] took for [her]
> own safety; [2] the extent to which [she] should have comprehended
> the risk as a result of warnings, experience, or other factors, and
> [3] the foreseeability of injury as a consequence of [her] conduct.

Id. (quoting Associated Engineers, Inc. v. Job, 370 F.2d 633, 641 (8th Cir. 1966)).

Ms. Larmon's negligence, if any, was not more than slight when compared
to that of the government.   Ms. Larmon remembers the morning of January 12,
2012, as a regular winter morning.   Ms. Larmon spent the day working in her
windowless office and was unaware of the day's weather conditions.   She was
wearing flat-heeled shoes with a rubber sole and was walking on the sidewalk at
a frequently used employee entrance of the Rushmore building.   Ms. Larmon
looked out and then down at the sidewalk as she walked.   She was not in a
hurry and was not using her cell phone.   Ms. Larmon saw a black band across
the width of the sidewalk.   She could not tell if it was ice or moisture on the
sidewalk.   She stepped on what she later learned was ice, slipped and fell.

A sign at the employee entrance instructed building occupants to "watch
for falling ice."   See Docket 20-1 at p. 53:15-21.   No salt was available at that
entrance of the Rushmore building for Ms. Larmon to use on January 12 and
none had been present leading up to her fall.   Military personnel's maintenance
of the sidewalk had become inconsistent.   (TE 32).

The government asserts the sign gave Ms. Larmon a clear public warning of the patch of ice.   The court disagrees.   Despite the fact that maintenance personnel had knowledge of this recurring patch of ice, the sign by its terms warned only of falling ice and made no mention of the nearby patch of ice, which on January 12 was approximately one foot across and extended the width of the sidewalk.   Ms. Larmon received no warning of the looming patch of ice.

The government's related assertion that Ms. Larmon was negligent by not asking military personnel for assistance in walking to and from her car fails to reflect the realities of the circumstances facing Ms. Larmon.   Approximately thirty people regularly used that employee entrance each day.   Under the government's logic, Ms. Larmon, and presumably the twenty-nine other employees, would have to request assistance both when walking into and out of the Rushmore building during winter months in order to remain non-negligent. This is highly impracticable.   Further, Ms. Larmon likely would have had to seek the assistance of the same personnel group that had failed to adequately maintain the sidewalk and restock the store of salt at that location.

The central point of the government's argument is that the sidewalk outside this entrance of the Rushmore building was known to be particularly icy and slippery, and it was foreseeable to Ms. Larmon that she could fall at this location; therefore, when Ms. Larmon exited the building as she normally would, she was negligent.   Implicit in this argument is that government personnel were also aware of the sidewalk's recurring icy condition and failed

16

to remedy it. The government cannot escape liability for its failure to
adequately maintain its sidewalks by imposing unreasonable and
impracticable requirements on the business invitees using its premises. See
Janis, 780 N.W.2d at 502 ("Tort law functions to promote care and punish
neglect by placing the burden of the breach on the person who can best avoid
the harm.") (internal quotation marks, citations and brackets omitted). The
court finds Ms. Larmon's negligence, if any, in stepping on the black band as
she walked on the sidewalk outside of the Rushmore building to be less than
slight in comparison to that of the government.

### III. Damages

Ms. Larmon does not seek to recover damages for medical expenses
paid by Tricare,[9] future medical care relating to her ankle fracture, or for the
aggravation of a pre-existing condition. (Docket 30 at pp. 4-5). Plaintiff
only seeks recovery for the out-of-pocket medical expenses paid by Ms.
Larmon, the reasonable value of time she lost from work as a result of her
ankle fracture, and the reasonable value of damages for past and future pain
and suffering, mental anguish and the loss of capacity of the enjoyment of life
as a result of her injury. See id. at 4-5.

---

[9]Tricare is a United States Department of Defense healthcare program for
active duty and retired military personnel and their dependents. Ms. Larmon
receives Tricare coverage through her husband, Ken Larmon, who was active
duty Air Force for twenty-four years. See Docket 20 at p. 8.

17

### A.    Past Medical Expenses

Ms. Larmon is entitled to recover the out-of-pocket medical expenses she incurred as a result of her ankle fracture.   Ms. Larmon incurred $554.72 in out-of-pocket medical expenses relating to her ankle.   (TE 103).   At trial, the government stipulated to this amount if the court found in favor of Ms. Larmon on liability.   The court finds that a damages award of $554.72 will reasonably and fairly compensate Ms. Larmon for the out-of-pocket medical expenses she incurred as a result of her ankle fracture.

### B.    Lost Wages

Ms. Larmon is entitled to recover wages she lost as a result of her ankle fracture.   See Byre v. Wieczorek, 217 N.W.2d 151, 156-57 (S.D. 1974).   The parties dispute the amount of lost wages that Ms. Larmon may recover.   The government posits Ms. Larmon's recovery is limited to $5,060.03.   (Docket 44 at p. 10).   Ms. Larmon asserts she is entitled to recover $7,883.07 in lost wages as a result of her ankle fracture.   (Docket 42 at p. 2).   At issue is whether South Dakota's collateral source rule permits Ms. Larmon's recovery of lost wages to be offset by partial salary payments made to her by the government after she redeemed her sick leave, annual leave and the donated leave of others.

"It is well settled under South Dakota law that '[t]otal or partial compensation received by an injured party from a collateral source, wholly independent of the wrongdoer, does not operate to reduce the damages recoverable from the wrongdoer.'"   Jurgensen v. Smith, 611 N.W.2d 439,

18

442 (S.D. 2000) (some internal quotation marks omitted) (quoting <u>Moore v. Kluthe & Lane Ins. Agency, Inc.</u>, 234 N.W.2d 260, 269 (S.D. 1975)).  The rationale underlying the collateral source rule is that a tortfeasor should not benefit from a plaintiff's receipt of payment from an unrelated source. <u>Moore</u>, 234 N.W.2d at 269.  "If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing."  <u>Id.</u> (internal quotation marks omitted).

The collateral source rule operates both as a rule of evidence and as a rule of damages.  "As a rule of evidence, it prohibits a defendant from offering proof of a plaintiff's collateral source benefits, received independent of the tortfeasor, that compensate the plaintiff, in whole or in part, for his or her injury."  <u>Cruz v. Groth</u>, 763 N.W.2d 810, 813 (S.D. 2009) (citing <u>Papke v. Harbert</u>, 738 N.W.2d 510, 532 (S.D. 2007)).  "As a rule of damages, it prohibits a defendant from reducing personal liability for damages because of payments received by the plaintiff from independent sources."  <u>Id.</u> (citing <u>Papke</u>, 738 N.W.2d at 532).

The government's contention that Ms. Larmon's lost-wage recovery must be reduced by partial salary payments she received as a result of leave donated to her by fellow government employees is inapposite.  Ms. Larmon's coworkers were under no obligation to donate their accrued leave to her.  The coworkers earned their leave independent of Ms. Larmon and gave it to her of their own

19

accord. The donated leave is a gratuitous benefit Ms. Larmon received from her colleagues during a period of hardship. See Degen v. Bayman, 241 N.W.2d 703, 709 (1976) (holding that "where the victim of a tort-feasor receives gratuitous medical services from a source wholly independent of the tort-feasor the value of the gratuitous medical services may not be deducted from the verdict for overall medical care received."). Ms. Larmon's recovery of her lost wages will not be reduced by the partial salary payments she received as a result of redeeming the donated leave of others.

South Dakota's collateral source rule prohibits Ms. Larmon's recovery of her lost wages from being reduced by the partial salary payments she received as a result of redeeming her sick and annual leave following her ankle fracture. The government argues because Ms. Larmon, an employee of the federal government, used her sick and annual leave to receive partial salary payments from a federal funding source, the source of the payments is not wholly independent of the tortfeasor, the federal government, and the payments should be excepted from South Dakota's collateral source rule. (Docket 44 at pp. 5-8). If not offset, the government asserts this scenario results in Ms. Larmon receiving a double recovery and it paying twice for her injury. Id. The government acknowledges neither the South Dakota Supreme Court nor the South Dakota Legislature has adopted such an exception to the collateral source rule. Id. at 4-8.

The court finds the analysis of the United States Court of Appeals for the Seventh Circuit instructive:

> Just because both recoveries come from the *defendant,* however, does not necessarily mean that they are coming from the same *source.* "The source of the funds may be determined to be collateral or independent, even though the [tortfeasor] supplies such funds. . . . Application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received." Thus, in order to determine whether the collateral source rule is applicable, courts have looked to the nature of the payment and the reason the payment is being made rather than simply looking at whether the defendant is paying twice.

Molzof v. United States, 6 F.3d 461, 465 (7th Cir. 1993) (emphasis in original) (quoting Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th Cir. 1972)).

The Fifth Circuit reached a similar conclusion. See United States v. Gallops, 207 F.2d 48 (5th Cir. 1953). In Gallops, the government argued the district court committed error in refusing to consider compensation paid to the plaintiff by the government in the form of sick and annual leave, which the government argued mitigated the plaintiff's damages. Id. The Fifth Circuit reasoned:

> The sick and annual leave payments were not in the nature of gratuities but were on account of accumulation earned by plaintiff previously. These payments were not made as compensation for the particular injuries suffered but because of a pre-existing agreement based upon length of employment.

Id.; see also Leeper v. United States, 756 F.2d 300, 306 (3d Cir. 1985) (agreeing with the Fifth Circuit's analysis in Gallops).

21

This rationale comports with the Eighth Circuit's analysis in <u>Overton v.</u> <u>United States</u>. 619 F.2d 1299 (8th Cir. 1980). In <u>Overton</u>, the plaintiff brought a FTCA claim against the government alleging injuries resulting from a swine flu vaccination. <u>Id.</u> at 1302. The issue in <u>Overton</u> was whether plaintiff's FTCA damage award could be reduced by the amount of Medicare payments the plaintiff already received in light of Missouri's collateral source rule. The Eighth Circuit articulated the two rationales supporting the collateral source rule under Missouri law. <u>Id.</u> at 1306. The first is that a tortfeasor "does not deserve to benefit from the fortuity that the plaintiff has received or will receive compensation from a source wholly independent of the [tortfeasor]." <u>Id.</u>

The second is that "the plaintiff deserves any additional compensation he may receive because he has 'contracted' for it, because it is in the nature of insurance." <u>Id.</u> "[O]ne can justify a double recovery where the original source was supplied by the plaintiff, himself, out of resources that would otherwise have been available to him for other purposes." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Smith v. United States</u>, 587 F.2d 1013, 1015 (3d Cir. 1978)). The Eighth Circuit ultimately determined "plaintiff's Medicare benefits were not in the nature of insurance as to her because she made no contribution toward Part A of Medicare. No rationale of the collateral source rule is implicated and therefore the Medicare benefits should have been deducted from the FTCA damage award." <u>Id.</u> at 1308.

22

The South Dakota Supreme Court is unwavering in its application of the collateral source rule.  See Cruz, 763 N.W.2d at 813; see also SDCL § 21-3-12 (The South Dakota Legislature created an exception to the collateral source rule in medical malpractice actions.).  "The rationale for [South Dakota's collateral source rule] is that a tort-feasor should not be allowed to benefit because the victim of his wrongdoing was able to receive gratuitous medical and nursing services for his injuries."  Degen, 241 N.W.2d at 708.  The South Dakota Supreme Court further reasoned:

> "[W]hile it has been recognized that at times the collateral source rule can produce a windfall for a plaintiff, courts have held that if a windfall occurs, it is better that the innocent plaintiff receive it than the guilty wrongdoer. . . . This, courts have held, furthers the intent of the collateral source rule, which is to preclude a defendant, the tortfeasor, from obtaining any benefit when a plaintiff receives collateral payments or benefits, such as gratuitous services, insurance coverage payments, social policy benefits, etc.

Papke, 738 N.W.2d at 533.

Ms. Larmon contracted to accrue sick and annual leave as a benefit of her employment at the Base.   The government admits Ms. Larmon accrued the sick and annual leave for which she was paid.   The government's partial salary payments to Ms. Larmon were not gratuities; nor were the payments meant to compensate her for the injuries she suffered as a result of the fall.  The government paid Ms. Larmon for the sick and annual leave she earned under the terms of her employment at the Base.   See Gallops, 207 F.2d at 50.  Had she not been injured in the fall, she would have been free to use her sick

23

and annual leave in the manner of her choosing, so long as the usage was in compliance with the government's human resources manuals.   See Dockets 43-1 at    pp. 23-25; 43-2 at pp. 24-26.

The court will not deduct the sick and annual leave payments Ms. Larmon received from her recovery for lost wages.   To do so would effectively create a new exception to South Dakota's collateral source rule, which the Supreme Court has shown reluctance to do.   The court's ruling does not provide Ms. Larmon with a windfall.   Ms. Larmon is simply receiving payment for the sick and annual leave she already earned through her employment with the federal government while also recovering the wages she lost as a result of her fall.   The government is not paying for the same injury twice but rather is satisfying two separate obligations owed to Ms. Larmon.   This scenario is not the effective equivalent of imposing punitive damages on the government.   See Docket 44 at pp. 9-10.   Even if Ms. Larmon's recovery is construed as a "double" recovery, the court's ruling furthers the intent of South Dakota's collateral source rule.   See Papke, 738 N.W.2d at 533.

Ms. Larmon seeks to recover payment for 663 hours of lost wages.   Ms. Larmon testified she was unable to work for 663 hours after she fractured her ankle on January 12, 2012.   See Docket 42 at p. 1.   Ms. Larmon and the government agree Ms. Larmon earned $11.89 per hour at that time.   Ms. Larmon seeks recovery of $7,883.07 (663 hours x $11.89) in lost wages.   Id. at 2.   After the government's calculation of Ms. Larmon's lost wages are

24

extrapolated to give effect to the court's rulings on liability and the applicability of South Dakota's collateral damage rule, the calculation is more than that requested by Ms. Larmon.    See Dockets 44 at p. 10 & 44-1.   The court will only award Ms. Larmon the damages she requests.   The court finds that a damage award of $7,883.07 will reasonably and fairly compensate Ms. Larmon for the wages she lost as a result of her ankle fracture.[10]

## C.   Pain and Suffering, Mental Anguish and Loss of Capacity of the Enjoyment of Life

Ms. Larmon is entitled to recover damages for "[t]he pain and suffering, mental anguish, and loss of capacity of the enjoyment of life experienced in the past and reasonably certain to be experienced in the future as a result of [her] injury." Gilkyson v. Wheelchair Exp., Inc., 579 N.W.2d 1, 6 (S.D. 1998). The severity of Ms. Larmon's ankle fracture and tibiotalar dislocation cannot be disputed.  See TE 25-29.  Ms. Larmon went to the emergency room following her fall on January 12, 2012, and received prescription medication to reduce her pain.   The next day she went to the Black Hills Orthopedic and Spine Center where Clark Duchene, M.D., performed surgery on her ankle. (TE 21).  Dr. Duchene inserted two headless compression screws into Ms. Larmon's medial malleolus and ten screws and one six to eight inch plate into her right fibula.  See id. at 8; see also Docket 16-5 at pp. 13-14 (Dr. Duchene's deposition).

---

[10]In light of the court's ruling, trial exhibits 9, 105 and 108 are refused.

Ms. Larmon was homebound from January 2012 to April 2012 following her fall.   She had to use a cane and walker for a period of time after the fall.   She was forced to install toilet and shower hand rails in order to use these facilities.   She continues to use the handrails.   Ms. Larmon testified she has experienced pain related to her ankle every day since her fall and her ankle regularly aches and nothing takes the pain away.   Her ankle pain frequently wakes her up in the middle of the night.   Ms. Larmon testified her ankle is permanently swollen and its mobility and strength have diminished. The top of Ms. Larmon's ankle is so sensitive that placing a blanket on it causes her pain.   Dr. Duchene opined that although no future medical procedures were likely needed, Ms. Larmon's symptoms of pain and physical impairment are likely permanent.   See TE 24.

Ms. Larmon has difficulty walking and has to use a motorized cart when she shops.   Because she has difficulty walking, she is frightened and apprehensive about frequenting locations where she will be forced to walk. Ms. Larmon testified she is less social, less confident and less willing to travel than she was prior to her fall.   Ms. Larmon's remaining life expectancy, as a fifty-nine year old white female, is approximately 24.5 years.   (TE 52).

Ms. Larmon's ongoing pain and suffering, mental anguish and loss of capacity of the enjoyment of life must be considered in light of her other ongoing health conditions.   Ms. Larmon gained weight after her fall and had lap band surgery.   She testified she lost eighty-eight pounds following the

surgery. Ms. Larmon had knee pain prior to the fall and continues to have knee pain after the fall. Ms. Larmon was diagnosed with osteoarthritis in both knees. See TEs 116-118. Ms. Larmon was prescribed physical therapy to ameliorate her knee pain both before and after her fall. See TE 115, 116 & 21. Ms. Larmon received injections of Depo-Medrol and Euflexxa to alleviate the pain in her knees following the fall. See TE 21 & 117. Although Ms. Larmon reported she did not respond well to the Depo-Medrol injection, she reported her knee pain subsided following the Euflexxa injections. After the fall, Ms. Larmon sought to renew her handicap sticker and cited her knee pain as the primary reason for the renewal. See TE 117 & 118.

Ms. Larmon's life has been irreparably altered as a result of the government's negligence. The pain Ms. Larmon experienced immediately following her fall and surgery can only be described as excruciating. Ms. Larmon continues to experience pain in her ankle on a daily basis. The functionality of Ms. Larmon's ankle has been significantly reduced and her symptoms of pain and impairment are permanent. Her ability to walk has diminished and her fear of being stranded in a location away from her house, car or support group has grown and caused her great anguish and trepidation. Ms. Larmon's capacity to enjoy life has shrunk as her inability to walk has tethered her to certain locations and artificial means of transportation. This is not the case with her knee pain. In coping with her

27

knee pain, Ms. Larmon stated she can simply receive an injection when the pain grows too severe and continue with her ordinary activities.

The court finds that a damage award of $100,000 will reasonably and fairly compensate Ms. Larmon for the pain and suffering, mental anguish, and loss of capacity of the enjoyment of life she experienced in the past.   After considering the time value of money and prevailing interest rates, the court finds a damage award of $240,000 will reasonably and fairly compensate Ms. Larmon for the pain and suffering, mental anguish, and loss of capacity of the enjoyment of life she is reasonably certain to experience in the future.

### ORDER

Based on the above analysis, it is

ORDERED that the government is liable to Ms. Larmon for $554.72 in past medical expenses and $7,883.07 in lost wages.

IT IS FURTHER ORDERED that the government is liable to Ms. Larmon for $340,000 in pain and suffering, mental anguish, and loss of capacity of the enjoyment of life she experienced in the past and is reasonably certain to experience in the future.

Dated July 29, 2016.

BY THE COURT:

JEFFREY L. VIKEN
CHIEF JUDGE

28